BOYD CAUDILL and MATELON CAUDILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Caudill v. Commissioner
Docket No. 6766-71
United States Tax Court
T.C. Memo 1974-232; 1974 Tax Ct. Memo LEXIS 87; 33 T.C.M. (CCH) 1025; T.C.M. (RIA) 74232; September 5, 1974, Filed. William H. Beck, for the petitioners. Conley G. Wilkerson, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency 1965
$ 769.28
1966
2,550.27
1967
2,046.90
1968
8,146.04
1969
22,669.21
1970
13,842.58
The question presented is whether petitioner Boyd Caudill is entitled to deduct under section 162 [1] the amounts he expended in connection with certain business operations during 1968 through 1970. *88 The answer to this question will also determine whether petitioner incurred a net operating loss in 1968 available for carryback to his taxable years 1965 through 1967. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided in Lawrenceburg, Kentucky, at the time of filing their petition in this case. They filed cash-basis joint Federal income tax returns for the taxable years in issue with the district director of internal revenue, Louisville, Kentucky, or the Internal Revenue Service Center, Cincinnati, Ohio. References to "petitioner" herein shall be deemed to mean Boyd Caudill. Throughout the taxable years in issue, petitioner was a physician engaged in the private practice of medicine in Lawrenceburg, Kentucky. Sometime prior to 1965, petitioner purchased a laundromat in Lexington, Kentucky (which is located some 22 miles from Lawrenceburg), owned it as an individual proprietor, managed it for several months together with his wife, and then sold it. In 1966, petitioner *89 acquired a 50-percent partnership interest in a laundry and dry cleaning business in Owensboro, Kentucky, which he sold on October 7, 1969. On April 30, 1965, Penta Corporation (hereinafter Penta or the corporation) was incorporated under the laws of the State of Kentucky. Its initial stock issue consisted of 1,000 shares of capital stock, which remained the only issued and outstanding stock of Penta throughout the years in issue. The individuals to whom the stock was initially issued and the number of shares issued to each were as follows: Shareholder
No. of shares Ramah Martin
400
R. R. Fishback
200
Jesse DeJarnette
200
Boyd Caudill
100
Edward Counts
100
In return for the issuance of Penta's stock, the sharehol In return for the issuance of Penta's stock, the shareholders contributed cash in the total amount of $30,000 and property with a fair market value of $7,500. This constituted the total capital with which Penta commenced business. On May 8, 1965, Penta, by its president Ramah Martin, and Ramah Martin, Jesse DeJarnette, and R. R. Fishback individually executed, as lessees, a lease of certain real property in Lexington, Kentucky, for *90 the purpose of conducting a laundry, dry cleaning, and automatic car wash business on such property. This lease was for an initial term commencing May 1, 1965, and ending May 31, 1974, and at a basic rent of $1,500 per month. During July 1965, Penta, by its president Ramah Martin, executed conditional sale contracts for the purchase of various laundry, dry cleaning, and automatic car wash equipment for the total price of $194,497.76, payable in equal monthly installments over a period of five years. Concurrently with the execution of such contracts, Penta, by its president Ramah Martin, and Ramah Martin, Jesse DeJarnette, R. R. Fishback, Edward Counts, and the petitioner individually executed as co-makers promissory notes in the total amount of the purchase price. During the summer of 1965, Penta began operating on the leased premises in Lexington a laundromat, a laundry and dry cleaning shop, and an automatic car wash. Until July 1967, Ramah Martin was the only stockholder of Penta actively engaged in the management of the corporation's business. About that time, difficulties arose as to Martin's management. The other stockholders hired an accounting firm to conduct an audit *91 of Penta's books and records. This audit showed that Penta was insolvent and unlikely to become profitable. The other stockholders also obtained the services of an attorney to bar Martin from any further participation in the management of the corporation. In November 1967, petitioner assumed the active management of the business, dividing his time between his medical practice in Lawrenceburg and the business in Lexington. Petitioner continued to manage the business throughout the remainder of the years in issue. On January 30, 1968, Penta, by its secretary Jesse DeJarnette, as lessee, and Jesse DeJarnette, R. R. Fishback, Edward Counts, and the petitioner, as sureties for Penta, executed an agreement to rent an electrical advertising sign for a term of 60 months at a rent of $90 per month. The sign was installed at the laundry and dry cleaning shop and bore the new trade name which had been adopted for that business. After the audit of Penta's financial condition and the ouster of Martin from the management of the corporation, DeJarnette, Fishback, and Counts lost interest in its affairs and abandoned any expectation of recouping their investment. Petitioner, however, devoted *92 himself to the management of the business with the hope of recovering at least part of his investment and perhaps turning it into a profitable business. In April 1968, petitioner, Counts, DeJarnette, and Fishback entered into an agreement which provided in pertinent part as follows: WHEREAS, Caudill, Counts, DeJarnette and Fishback are stockholders and members of the Board of Directors of Penta; and WHEREAS, said individuals are also personally liable for certain indebtednesses of the corporation * * * and WHEREAS, it is recognized that Penta Corporation is insolvent, but that by reason of the individual liability of the aforesaid four individuals, they have each decided and agreed that they do not desire to place the Penta Corporation into bankruptcy; and WHEREAS, Caudill desires to buy and Counts, DeJarnette and Fishback desire to sell to Caudill all of their stock in the Penta Corporation, and be relieved of certain individual liabilities, all of which is now specifically set forth herein. NOW, THEREFORE, for and in consideration of the mutual promises and agreements of the various parties hereto as hereinafter set forth, all parties to this contract do hereby agree *93 as follows: (1) This agreement does not affect in any way the assets of the Penta Corporation or title to any property, real or personal, held by the Penta Corporation. (2) Counts, DeJarnette and Fishback each hereby agree to pay to Caudill a sum equal to 25% of the schedule of expenses relative to operation of the Penta Corporation prior to March 31, 1968. * * * * * * (4) Counts, DeJarnette and Fishback hereby agree to transfer all stock owned by each in the Penta Corporation to Caudill immediately upon execution of this contract. (5) Counts, DeJarnette and Fishback hereby waive any and all right or claim that they now have against the Penta Corporation or Caudill for any sums loaned or paid to the Penta Corporation or Caudill or on their account and hereby affirmatively state that subsequent to the execution of this contract, they have no claim against either Caudill or the Penta Corporation, except as specifically provided in this contract. (6) Caudill hereby individually assumes liability and responsibility for notes and obligations of the Penta Corporation for which he and the other members to this contract, that is Counts, DeJarnette, and Fishback, are individually *94 liable * * *. It is understood and agreed by all parties hereto that these indebtednesses are in fact the debts of the Penta Corporation, but by virtue of accepting responsibility individually, the parties to this contract are likewise liable to said creditors; that this agreement is not intended and does not in any way affect or relieve the Penta Corporation from its initial liability and responsibility for said debts, but only affects the liability and responsibility of the other parties hereto as suretors or guarantors on such indebtednesses. Caudill further hereby agrees to indemnify Counts, DeJarnette and Fishback from any and all liabilities which they now have or may in the future have by reason of the aforementioned indebtednesses, and Caudill further agrees to indemnify them, or any of them, by reason of any claims that may be made against them by reason of their previous participation in the Penta Corporation as officer, director or stockholder, and including holding them harmless for any attorney fees or other expenses resulting from such participation. From the date Penta commenced business through December 31, 1968, DeJarnette, Fishback, Counts, and the petitioner *95 made payments to or on behalf of the business in the total amount of $155,615.39. The amounts so paid were used to defray the expenses of the business, including rent, the installment payments for the purchase of equipment and the rent for the electrical advertising sign. In the year of payment, the shareholders' payments were initially recorded on the books and records of Penta as notes payable to the shareholders, but at the end of each year the amounts so recorded were transferred to paid-in surplus. Of the total payments by DeJarnette, Fishback, Counts, and the petitioner, $63,982.98 [2] were payments properly attributable to petitioner. Of the latter amount, petitioner paid approximately $25,000 in years before 1968. On his Federal income tax return for 1968, petitioner claimed a deduction under section 162 in the amount of $63,982.98 for the payments he made. During 1969 and 1970, petitioner made total payments in the respective amounts of $75,354.26 *96 and $56,207.02, and claimed such amounts on his Federal income tax returns for 1969 and 1970 as deductions under section 162. These payments were recorded on Penta's books and records as paid-in surplus and were also used to pay the obligations of the corporation. Sometime in 1969, petitioner decided to close the laundromat and it was sold at a loss. Operations of the laundry and dry cleaning shop and automatic car wash were continued. During the taxable years in issue, petitioner did not receive any dividend or interest income from Penta or any compensation for the services he performed. During the taxable years in issue, Penta maintained its own separate books and records, filed Federal and state income tax returns, and carried on business in its own corporate and trade names. On April 15, 1969, petitioners applied to respondent for a tentative carryback refund arising from the carryback to their taxable years 1965 through 1967 of a claimed net operating loss for 1968 in the amount of $32,001.63.Acting upon such application, respondent allowed the claimed net operating loss for 1968 in the amount of $32,001.63 to be carried back to petitioners' taxable years 1965 through *97 1967 in the respective amounts of $8,077.95, $15,362.27, and $8,561.41, and as a result, petitioners were tentatively allowed refunds of the taxes they paid for 1965 through 1967 in the respective amounts of $769.28, $2,550.27, and $2,046.90. In a notice of deficiency, respondent later disallowed the deductions which petitioners claimed under section 162 for 1968, 1969, and 1970 on account of the payments he made. Respondent determined that such payments did not constitute ordinary and necessary expenses of petitioner's business, but were allowable only as capital loss deductions, subject to the $1,000 per year limitation of Section 1211(b). Respondent further determined that disallowance of the section 162 deduction for 1968 resulted in there being no net operating loss for that year available for carryback to 1965, 1966, and 1967. ULTIMATE FINDINGS OF FACT During the taxable years in issue, Penta was a separate taxable entity to or on whose behalf petitioner made the payments in question. Such payments constituted additional investment in Penta and petitioner's dominant motive in making such payments was to preserve or enhance the value of that investment. OPINION *98 The question presented is whether certain payments by petitioner were made for his own account and deductible under section 162 or were made to or on behalf of a corporation of which he was the controlling shareholder for most of the period in question and therefore nondeductible investments in that corporation. During the years in issue, petitioner was actively engaged in managing the business involved herein and was also jointly or secondarily liable to pay certain of the obligations of the business. In terms of the statute, petitioner's claim must fail because the expenditures he made were not those of his own trade or business, but rather those of the corporation's business.[3] The rule is well settled that a shareholder is not entitled to a deduction for paying the business expenses of his corporation. This is true even when, as in the present case, the shareholder owns all or a majority of the corporation's stock [4] and is in complete control of the corporation's affairs. ; ; ; ; *99 . At trial and on brief, petitioners have argued that Penta should be disregarded and its business activities be treated as those of the petitioner. The evidence presented fails to support any such contention. Penta was a validly organized corporation and a substantial business was carried on throughout the years in issue in its own corporate and trade names. It maintained its own separate books and records, filed Federal and state tax returns, owned property, and contracted on its own behalf. Under such circumstances, there is no basis for disregarding Penta as an entity separate and distinct from petitioner. The evidence shows that petitioner was the proprietor of a laundromat in Lexington, Kentucky, sometime prior to *100 1965 and was a partner in a laundry and dry cleaning business in Owensboro, Kentucky, from 1966 to 1969. While such evidence tends to show that petitioner may have been individually engaged in these lines of business at various times, it does not follow that Penta's activities in the same or similar lines of business were a part of petitioner's individual business. Cf. . The evidence is to the contrary; the laundromat, the laundry and dry cleaning shop, and also the automatic car wash were all owned and operated in every respect as the business of the corporation and not as petitioner's individual business. Neither does the fact that petitioner may have been jointly liable with Penta for certain of the expenses, because he co-signed a lease or note with the corporation, improve petitioner's claim for a deduction under section 162. Whether primarily or secondarily liable for the payment of the expenses, they all arose in connection with Penta's business and not the individual business of petitioner. Petitioners suggest for the first time on brief that the payments to or on behalf of Penta are deductible as business bad *101 debts. Petitioner himself testified that his dominant motive for making such payments was to protect or enhance the value of his investment in the corporation.[5] Under such circumstances, a business bad debt deduction is not allowable to petitioner, but only the capital loss deduction (nonbusiness bad debt) to which respondent concedes petitioner is entitled. . (C.A. 2, 1961), relied upon by petitioners, is clearly distinguishable. There the taxpayer made the loan in order to protect his compensation as an employee. Petitioner did not receive or expect to receive any compensation for services to Penta during the years in issue. *102 In affd. per curiam (C.A. 9, 1968), we denied claimed deductions for expenditures made to keep a business alive on the ground that it was the business of the corporation and not that of the individual who had taken over from controlling shareholders. The striking similarity between the facts of that case and those involved herein dictate that we should reach the same conclusion herein. Decision will be entered for the respondent. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. ↩
2. Such amount does not include any of the payments which petitioner received from DeJarnette, Fishback, and Counts as reimbursements pursuant to numbered paragraph (2) of their agreement of April 1968, p. 8, supra. ↩
3. We note in passing that some of the amounts paid by petitioner were made under the conditional sales contracts by which certain equipment was acquired and could, even under petitioners' theory be at best considered expenditures for depreciable property. ↩
4. Insofar as the record reveals, Ramah Martin continued to own 400 shares of Penta stock after his ouster from the management of the corporation. ↩
5. It is also suggested on brief that petitioner continued the business to avoid damage to his reputation as a doctor which might result from Penta's bankruptcy. Petitioner himself gave no testimony whatsoever on this issue. The only allusion to this possibility was during the course of the testimony of petitioner's accountant. The record herein does not even begin to satisfy the standard enunciated in . ↩